**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**

JILL R. DUNCAN,                    )
                                   )
              Plaintiff,           )
                                   )
v.                                 )        Case No. CIV-06-035-KEW
                                   )
STANDARD INSURANCE COMPANY,        )
                                   )
              Defendant.           )

**OPINION AND ORDER**

This matter comes before the Court on the briefs submitted by the parties for the Court to review on the merits the decision by Defendant to deny Plaintiff's claim for disability benefits under an ERISA qualified plan.  Upon review and consideration of these documents, this Court renders this ruling.

Plaintiff was employed by the Tulsa Teachers Credit Union. As a benefit of that employment, Plaintiff was eligible to participate in a long-term disability plan (the "Plan").  The Plan was funded through the purchase of a group long-term disability insurance policy from Defendant, which also acted as a claims administrator.

The provisions of the policy define a "disability" as follows:

**Definition of Disability**

You are disabled if you meet one of the following
definitions during the periods they apply:

    A.    Own Occupation Definition of Disability.

    B.    Any Occupation Definition of Disability.

A.    Own Occupation Definition of Disability.

During the Benefit Waiting Period and the Own Occupation

Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1.   You are unable to perform with reasonable continuity the Material Duties of you Own Occupation; and

2.   You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

Note: You are not Disabled merely because your right to perform your Own Occupation is restricted, including a restriction or loss of license.

During the Own Occupation Period you may work in another occupation while you meet the Own Occupation Definition of Disability.  However, you will no longer be Disabled when your Work Earnings from another occupation meet or exceed 80% of your Indexed Predisability Earnings.  Your Work Earnings may be Deductible Income. . . .

Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins.  In determining you Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy.  If you Own Occupation involves the rendering of professional services, and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

Material Duties means the essential tasks, functions, and operations, and the skills, abilities, knowledge, training, and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.  In no event will we consider working an average of more than 40 hours per

week to be a Material Duty.

B.     Any Occupation Definition of Disability.

During Any Occupation Period you are required to be disabled from all occupations.

You are disabled from all occupations if, as a result of your Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform within reasonable continuity the Material Duties of Any Occupation.

Any Occupation means any occupation or employment which you are able to perform, whether due to education, training or experience which is available at one or more locations in the national economy and which you can be expected to earn at least 60% of your indexed pre-disability earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

Material Duties means the essential tasks, functions, and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.  In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

The Plan provides Defendant with "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."  This includes "the right to determine . . . entitlement to benefits."

On August 18, 1999, Plaintiff was admitted to Saint Francis Hospital, attended by Riley M. Hill, M.D., "with a history of progressive droop and speech difficulties."  Dr. Hill noted a 22-

month history of progressive problems with pain and burning in Plaintiff's toes. At the time of presentation, Plaintiff had experienced two days of nausea and vomiting with a headache and abdominal pain. Dr. Hill diagnosed Plaintiff with (1) right facial droop with speech difficulties, (2) right paresis with speech difficulty, (3) polyneuropathy, and (4) abdominal pain and hypertension.

On August 17, 2000, Plaintiff was again admitted to Saint Francis Hospital. Dr. Hill diagnosed Plaintiff with (1) cerebrovascular accident ("CVA"), (2) idiopathic peripheral neuropathy, and (3) hypertension. Dr. Hill noted Plaintiff's "recent medical history is significant for progressive peripheral neuropathy of the distal lower extremities." He found Plaintiff had "marked decrease in sensation in the feet bilaterally. There was marked paresis of the right thigh, as well as lower extremity in comparison with the left."

In a note dated February 8, 2002, Dr. Hill also indicates in the medical records that Plaintiff suffers from autoimmune neuropathy. He reported this finding in an attempt to obtain insurance payment for a medication he recommended for Plaintiff's use to treat her condition.

Plaintiff also has a history of sleep apnea. On March 23, 2002, Plaintiff underwent a sleep apnea study at Southcrest Hospital in Tulsa, Oklahoma. The resulting polysomnography report

indicates Plaintiff experienced loud snoring and excessive daytime hypersomnolence and diagnosed her with obstructive sleep apnea. The testing physician, Brian Worley, M.D., recommended a nasal C-PAP.  A May 19, 2003 report from the Washington University Sleep Disorders Laboratory indicates Plaintiff experienced an abnormal all-night polysomnogram evidencing mild obstructive sleep apnea syndrome accompanied by mild to moderate fragmentation of sleep.

Dr. Hill also indicates in a report dated May 8, 2002 Plaintiff was "having some trouble [with] awakening frequently [with the] C-PAP - pain continues to be severe - no sig. relief with the epidural still sleeping at desk."  The record demonstrates Plaintiff complained she could not use the C-PAP machine all night and still suffered from falling asleep during the daytime and while driving to the extent Plaintiff was "not working" and "almost had a wreck last night."

Plaintiff also suffers from neuropathic ulcers on her legs and received treatment in August of 2002.  However, the condition persisted, requiring treatment in October of 2002.

On October 7, 2002, Plaintiff was attended by Jeanne M. Edwards, M.D., a neurologist practicing in Tulsa, Oklahoma.  Dr. Edwards evaluated and treated Plaintiff's "painful peripheral neuropathy."  Plaintiff was being seen by the chronic pain program, wherein she was being considered for the placement of a pump. Plaintiff was also found to be suffering from restless leg

syndrome.  Dr. Edwards also saw Plaintiff on June 19, 2003 for evaluation of her "CVA, restless legs, and sleep apnea" as well as reported depression, for which she was taking Lexapro.

On November 19, 2003, Plaintiff was treated at Springer Clinic, complaining of two open ulcers on her left leg and one on her right.  Plaintiff also reported she suffered from hypersomnolence, stating she was very groggy in the morning and sleepy during the day.  Plaintiff was prescribed Methadone, Permolin, Provigil, and Mirapex.

On April 28, 2003, Defendant received a form completed by Plaintiff entitled "Disability Claim Employer/Employee Statement" dated April 1, 2003.  On this form, Plaintiff claimed the nature of her illness as "neuropathy" first noticed in October of 1997, "stroke" first noticed in August of 1999, and "narcolepsy" first noticed in January of 2003.  Plaintiff's last active day of work at her employer, Tulsa Teachers Credit Union, is reflected as March 31, 2003.  Plaintiff identifies the date she became unable to work because of her disability as April 1, 2003.

Plaintiff's physician, Jeanne M. Edwards, M.D., also completed part of the form entitled "Disability Claim Attending Physician's Statement."  Dr. Edwards' statement reflects a diagnosis of CVA, neuropathy, restless leg syndrome, and sleep apnea.  Dr. Edwards concluded Plaintiff can sit for 8 hours but can stand less than one hour, walk less than one hour, cannot bend or stoop, and it is

unknown whether Plaintiff can work or not.  On April 21, 2003, Dr. Edwards also wrote a letter stating that, because of Plaintiff's diagnosed conditions, "I do not feel she is capable to meet her job requirements on a full time or part time basis."

By correspondence dated May 22, 2003, Defendant acknowledged Plaintiff's submission as an application for Short Term Disability benefits.  Defendant informed Plaintiff that under the terms of the policy, no Short Term Disability benefits would be paid for any period for which she was receiving "sick leave pay, annual or personal leave pay, or other salary continuation, including donated amounts" from her employer.  Because Plaintiff was entitled to receive paid sick leave from March 31, 2003 to September 16, 2003, Defendant denied Plaintiff's claim for Short Term Disability benefits.  Defendant also informed Plaintiff in the letter that the policy provided for Long Term Disability benefits which become payable after a 90-day benefits waiting period and that if Plaintiff remained disabled after this waiting period and wished to apply for Long Term Disability benefits, she should submit a completed Long Term Disability Attending Physician's Statement.  A copy of the form was enclosed with the letter.

On September 16, 2003, Defendant received copies of Dr. Edwards' medical records concerning Plaintiff.

On September 26, 2003, Plaintiff was informed by Defendant that the initial review of her claim had been completed but that

the file was being forwarded to a physician consultant to determine Plaintiff's limitations and restrictions. To that end, Connie Dees, R.N., noted Plaintiff's prior diagnoses of CVA, neuropathy, restless leg syndrome and sleep apnea and requested a physician consultant to review and answer the following questions:

* As the claimant has had these conditions for several years, is there any medical documentation in file that supports the conditions have changed to cause limitations & restrictions?

* Does the medical records document any limitations & restrictions? If so – what are they & what is the duration of impairment?

On October 17, 2003, Plaintiff submitted a Long Term Disability Attending Physician's Statement completed by Dr. Edwards to Defendant. This Statement reflects a primary diagnosis of CVA and secondary diagnoses of neuropathy, restless leg syndrome, sleep apnea and depression.

On November 11, 2003, Janette Green, M.D., the consulting physician to whom Plaintiff's medical records had been referred for evaluation, issued a memorandum to Connie Dees, R.N. regarding Plaintiff's medical limitations. Dr. Green concludes:

This is a 45-year-old female with a long history of chronic pain secondary to peripheral neuropathy. She has been on narcotics for this chronic pain for some time and there is not evidence that there was any change in her medications around the time of her cease work date or after. Though she had problems with lower extremity ulcers, documentation does not indicate any ongoing problem after October 2002, and no indication of any changes in her neuropathy around the time of her cease work date. She also has a history of CVA; neuro exam

8

showed no neurological deficits, and no change in her condition prior to, or around of her cease work date. The claimant carries a diagnosis of depression, but there is no evidence that this is of a severity that would be limiting. Obstructive sleep apnea was diagnosed in March 2002. Despite the use of a CPAP and Provigil, the claimant continues to complain of daytime hypersomnolence. The documentation is not sufficient to base any limitations or restrictions due to hypersomnolence.

In summary, the documentation available to the Standard does not support limitations or restrictions that would preclude the claimant from her own occupation on a full-time basis.

On November 17, 2003, Defendant obtained a Dictionary of Occupational Titles Job Description Report for a Loan Officer. This report describes Plaintiff's job as "[i]nterviews applicants, and examines, evaluates, and authorizes or recommends approval of customer applications for lines or extension of lines of credit, commercial loans, real estate loans, consumer credit loans, or credit card accounts." Based upon this description and the demands required for the occupation, Defendant concluded Plaintiff's job represented sedentary work.

Also on November 17, 2003, Defendant sent Plaintiff a letter denying Plaintiff's claim for Long Term Disability benefits. Defendant states:

In summary, the medical records submitted do not document limitations and restrictions from any of your conditions that would prevent you from performing your own occupation as a tel-loan operator. Therefore, you do nor meet the definition of disability and your LTD claim is denied.

In a letter dated December 10, 2003, Plaintiff and her husband requested Defendant to conduct a review of the medical records, indicating additional medical information would be submitted to Defendant for review since "[i]t is our contention that inadequate documentation was included in the first review and the review does not in fact reflect the opinion of our many physicians in regards to Jill Duncan's disability." Defendant responded to the letter on January 5, 2004, stating a review would be deferred 45 days to permit Plaintiff to submit additional documentation.

On February 12, 2004, Plaintiff submitted additional medical records for Defendant's review. Defendant advised Plaintiff by letter dated February 13, 2004 that the review process would begin.

These additional records reflect a visit to Springer Clinic in Tulsa on November 13, 2003 wherein Plaintiff complained that her hands and feet hurt all of the time, that she suffered from chronic drowsiness and that she would be applying for Social Security and disability. Plaintiff was attended by Riley Hill, M.D. on this visit. The records for this visit appear to be incomplete in the administrative record submitted in this case.

On December 3, 2003, Plaintiff again presented to Dr. Hill, complaining of chronic pain and ulcers. Dr. Hill concluded Plaintiff suffered from (1) progressive peripheral neuropathy – auto immune; (2) numerous skin lesions; (3) severe depression and sleep disturbance, noting Plaintiff was not suicidal; and (4)

hypertension. Dr. Hill reached a similar diagnosis after Plaintiff presented herself to him on December 9, 2003.

The additional records submitted to Defendant by Plaintiff includes visits to Dr. Edwards on April 7, 2003, June 19, 2003 and October 20, 2003. Dr. Edwards referred Plaintiff to a chronic pain management professional to assist her in controlling the pain associated with her neuropathy and a sleep center for evaluation of her sleep apnea.

The supplemental records demonstrate Plaintiff received treatment for her neuropathic ulcers, which continued to cause her pain and her sleep apnea on January 30, 2001, April 1, 8, 2002, May 8, 2002, July 10, 23, 25, 31, 2002, August 2, 6, 9, 16, 23, 2002, October 8, 17, 22, 24, 28, 30, 2002 November 1, 19, 21, 2002. Severe depression is noted in visits on June 12, 2001, August 24, 2001, November 1, 2001 and February 8, 2002. On July 10, 2001, Plaintiff reported to Dr. Hill that she was experiencing problems at work from CVA and neuropathy.

On December 12, 2001, Plaintiff was referred by Dr. Hill to Bhadresh L. Bhakta, M.D. for pain management. Dr. Bhakta diagnosed Plaintiff with neuropathic bilateral lower extremity pain, neuropathic bilateral hand pain, depression, sleep disturbance secondary to pain, questionable diagnosis of inflammatory neuropathy based on nerve biopsy and possible vascular insufficiency. Dr. Bhakta prescribed Methadone and Ultram for

11

Plaintiff's pain with the possibility of the use of lumbar sypathetic blocks, epidural or a spinal cord stimulator. Plaintiff continued to see Dr. Bhakta for pain medication and treatment on January 10, 2002, February 28, 2002, May 6, 2002, June 10, 2002 and June 19, 2002.

Plaintiff received a mental status examination in connection with her claim for Social Security disability benefits on January 3, 2004 by Stephen C. Crall, Ph.D., a licensed psychologist. Dr. Crall diagnosed Plaintiff at Axis I with Major Depression Disorder, Moderate, Chronic; Axis II with No Diagnosis; Axis III with Autoimmune Neuropathy and history of Cerebral Vascular Accident (by patient report); Axis IV with Unemployment and Inadequate Finances; and Axis V with a Global Assessment Function of 45.

On February 13, 2004, Defendant referred Plaintiff's records for evaluation to a different physician consultant than had assessed her condition in the first report to Defendant. Again, the questions posed to the new consultant consisted of:

1.   What are the claimant's limitations & restrictions?

2.   When did the limitations & restrictions begin?

3.   What is the duration of impairment?

Plaintiff's condition was examined by Elias Dickerman, M.D., Ph.D., Consulting Physician, Neurology. Dr. Dickerman states that "[t]he majority of the records that have been submitted are, in fact, duplicates of the records already available for review." He

also recognized the limitations in the record in setting forth,

> This patient has a chronic history of painful sensations
> in the lower extremities and upper extremities. The
> original workup for this so-called peripheral neuropathy
> is not available for review. It is said that she had had
> electrodiagnostic studies, the results of which are not
> available for review, eventually undergoing sural nerve
> biopsy, which revealed some inflammatory changes. Those
> records are not available, but on the basis of those
> changes, it was felt that this patient had autoimmune
> neuropathy, and in addition to the use of chronic pain
> medications and analgesics, she was placed on Imuran.
> That condition essentially has not changed. She has had
> evaluations by neurology, as well as pain management;
> concurrence is noted.

With regard to Dr. Crall's diagnosis of Major Depression, Dr.

Dickerman notes

> when one looks at the actual mental status examination of
> this patient, there were no significant findings, with
> normal cognitive functioning, memory, etc. Dr. Crall did
> not make any comment regarding the patient's ability to
> work, only the fact that her condition would not change,
> indicating a major depressive disorder, moderate,
> chronic. In this regard, this patient has had a moderate
> chronic depression for many years, and has been on
> antidepressant medications, unchanged, with no
> significant change in intervention noted over the years,
> including at the time that she ceased work to the
> present.

Dr. Dickerman summarized his findings as to Plaintiff's

physical condition as follows:

> this patient has had a chronic pain syndrome with an
> unclear etiology or diagnosis. There are no
> electrodiagnostic studies for review. It is felt that
> this patient has had an autoimmune neuropathy. This
> chronic pain syndrome is somewhat unusual, in that the
> neurological examinations of this patient have revealed
> normal power, no atrophic changes, decrease in vibratory
> sense but intact other modalities, and preservation of
> the reflexes throughout. This would suggest that if, in

13

fact, she has a neuropathy, it is a small fiber neuropathy, not a large fiber neuropathy. There has been no change in this chronic pain syndrome, and no neurological finding of consequence that would prevent this patient from performing full time sedentary activities.

Similarly, this patient has a chronic sleep disorder with some degree of restless leg syndrome. The restless leg syndrome is well controlled. The sleep disorder is a mild obstructive apnea, does not appear significant, and is responsive to the use of CPAP.

With respect to the CVA, she had a small lacune. She has had no significant sequela from such. That is stable, without recurrence.

As a result, Dr. Dickerman concluded Plaintiff's chronic problems had not changed and "did not sustain any significant change at the time that she ceased work." He states that

at no time has she been limited or restricted or unable to perform full time sedentary activities of her own occupation. She has never been limited or restricted from performing the occupation from the time that she ceased work to the present. Although she has multiple diagnoses, she does not have an impairment from these diagnoses or from depression.

By correspondence dated May 27, 2004, Defendant denied Long Term Disability benefits to Plaintiff, noting that the previous denial had been reviewed and the same conclusion had been reached. Namely, Defendant found Plaintiff could still perform the functions of her job duties as a loan officer, designated as sedentary level work. The letter references the fact that the physician consultant had found Plaintiff had worked with the identified chronic conditions in the past and no significant changes had occurred

which would have required Plaintiff to cease work.

Plaintiff initiated this action on January 24, 2006, seeking review of Defendant's denial of benefits and alleging the denial represents an arbitrary and capricious act. As a part of the briefing submitted by the parties, the administrative record has been produced. This Court has reviewed the record under the presumption that the documents submitted and only those documents were before Defendant when it made its ultimate decision.

## I.  Standard of Review

The parties appear to be in agreement that the Plan is an ERISA qualified plan. The Plan in this case gave Defendant "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." The Plan also provided Defendant the authority to determine the entitlement to benefits. Typically, decisions by administrators given this level of authority by an ERISA qualified plan would be given considerable deference, requiring the reviewing court to scrutinize the administrator's decision under an arbitrary and capricious standard. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109-11 (1989)(an action brought under section 1132(a)(1)(B), discretionary actions of fiduciary reviewed under arbitrary and capricious standard);

<u>Woolsey v. Marion Lab., Inc.</u>, 934 F.2d 1452, 1457 (10th Cir. 1991);

<u>Pratt v. Petroleum Prod. Management Inc. Employee Savings Plan &</u>
<u>Trust</u>, 920 F.2d 651, 657-58 (10th Cir. 1990). "In determining
whether the plan administrator's decision was arbitrary and
capricious, the district court may consider only the arguments and
evidence before the administrator at the time it made the
decision." <u>Sandoval v. Aetna Life & Casualty Ins. Co.</u>, 967 F.2d
377, 380 (10th Cir. 1992)(citations omitted).

However, the Tenth Circuit Court of Appeals has modified the
arbitrary and capricious reviewing standard where an administrator
is operating under a conflict of interest. <u>Fought v. Unum Life</u>
<u>Ins. Co. of America</u>, 379 F.3d 997, 1003 (10th Cir. 2004) *cert.*
*denied* 544 U.S. 1026 (2005). Specifically, a "sliding scale
approach" is required when an administrator is found to have a
conflict of interest which decreases "the level of deference given
to the conflicted administrator's decision in proportion to the
seriousness of the conflict." <u>Chambers v. Family Health Plan</u>
<u>Corp.</u>, 100 F.3d 818, 825 (10th Cir. 1996).

Defining the level of the conflict of interest establishes how
far the scale slides in reviewing the administrator's decision.
The Tenth Circuit has distinguished between "standard" and
"inherent" conflicts. A "standard" conflict arises when a
fiduciary acts in two capacities in which case the beneficiary
under the ERISA plan must prove the existence of a conflict.

<u>Fought</u>, 379 F.3d at 1005. An "inherent" conflict includes the circumstance when the administrator is also the insurer under the plan. <u>Id</u>. at 1006. When this conflict is apparent, "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." <u>Id</u>.

The latter, least deferential standard applies to this case. Defendant is both the administrator and insurer under the Plan. As such, the arbitrary and capricious standard is modified to shift the burden to Defendant to demonstrate the reasonableness of its actions.

## II. **Evaluation of Defendant's Determination**

The unequivocal language of the Plan provides that a claimant under its terms must, in essence, be unable to perform the essential tasks required by their particular job as a result of a disability. In this instance, Defendant found Plaintiff's medical conditions must be such that she cannot perform the material duties of her job as a loan officer. Defendant correctly and reasonably interpreted the terms of the Plan in assessing the requirements Plaintiff must demonstrate in order to be considered disabled on a long-term basis.

In determining the essential tasks or material duties of Plaintiff's job, Defendant consulted with the Dictionary of Occupational Titles. This consultation reflected a measured and

17

reasonable approach to establishing objective standards by which to assess any medical findings by the consulting physicians. Defendant concluded from a review of the DOT that Plaintiff's job as a loan officer involved sedentary work – a determination not uncommon in the realm of Social Security benefits and not outside the bounds of reasonableness for use in the context of ERISA evaluations.

Defendant next consulted with Dr. Green to determine any limitations or restrictions upon Plaintiff's physical condition due to her acknowledged medical problems. Dr. Green, from all outward appearances contained in her report, carefully and thoughtfully reviewed Plaintiff's medical records submitted in support of her claim. Dr. Green found that the various conditions from which Plaintiff admittedly suffered were being treated and had not shown indications of a progressive degradation in her conditions such that she would be unable to perform the essential functions of her sedentary job of loan officer.

At Plaintiff's request, Defendant conducted a second review of her claim for benefits, employing a second, different consulting physician – an act indicating an attempt at impartiality. Defendant permitted Plaintiff to submit additional medical documentation in support of her claim, as she requested. Defendant submitted the medical documentation to Dr. Dickerman, a board certified neurologist. Dr. Dickerman, while noting some

deficiencies in the documentation, expressed no reservation in his conclusions concerning Plaintiff's ability to perform her work without significant restrictions or limitations. In particular, this Court notes Dr. Dickerman's conclusions regarding Plaintiff's neurological condition. In particular, Dr. Dickerman states Plaintiff's CVA is "stable, without recurrence."

At all times during the claims process, Defendant advised Plaintiff of her rights under the Plan, provided her with opportunities to submit additional records and kept her informed through correspondence of the progression of her claim. Nothing in this correspondence to either Plaintiff or the consulting physicians indicates an undertone of bias or predetermination with regard to Plaintiff's claim. In short, this Court finds Defendant interpreted each parties' obligations and requirements under the Plan reasonably and its ultimate conclusion, denying Plaintiff's claim for long-term disability benefits, is supported by substantial evidence contained in the administrative record.

### III.  Plaintiff's Arguments in Opposition

Plaintiff contends the "internal paper review by in-house doctors" does not represent a sufficiently independent review to be reasonable. Plaintiff argues an independent medical examiner should have conducted an investigation of her condition to ascertain whether she could or could not perform her job. Plaintiff also challenges the conclusions by Defendant's medical

examiners that no change in her condition occurred from the time she worked until the time she ceased working so, therefore, she is not disabled. Plaintiff asserts Dr. Dickerman acknowledged a lack of records which should have triggered an additional medical review by an independent physician.

Plaintiff's characterization of the reviewing physicians as "in-house doctors," to the extent such a characterization is damning of their opinions, has no foundation or support in the record submitted in this action. Dr. Green specialized in internal medicine while Dr. Dickerman is a board certified neurologist. Nothing in the record suggests a challenge to the impartiality of either of these physicians. Moreover, Plaintiff contends Dr. Edwards as Plaintiff's treating physician should be afforded more weight in her opinions than those proffered by the physicians consulted by Defendant. The prevailing case authority, however, does not support this position. Indeed, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Buckardt v. Albertson's, Inc.</u>, 2007 WL 867193, 7 (10th Cir. (Wyo.)) citing <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003). As such is the case, the opinion of Dr. Edwards is afforded no greater deference than that

offered by the two consulting physicians.

In a similar and related vein, Plaintiff next contends the consulting physicians should have conducted an independent medical examination of her before reaching their conclusions. It is apparent that Plaintiff misapprehends the meaning of the term "independent investigation" as used in the Fought decision. In Fought, the Tenth Circuit states "[w]hen it is possible to question the fiduciaries' loyalty, [plan administrators] are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." Fought, 379 F.3d at 1015 citing Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998). "Seeking independent expert advice is evidence of a thorough investigation." Id. By any reasonable reading, Fought does not require that an independent medical examination of a plan claimant be performed before a plan administrator may be deemed to have conducted a reasonable investigation. Rather, consultation with an independent medical expert is the required standard.

Defendant in this case consulted with two different medical experts before reaching a decision – the first before making its initial determination and the second as a part of the subsequent review of its original decision. Plaintiff's conclusion that these medical experts were "hired guns" with opinions favoring

Defendant's position has apparently jaded Plaintiff's position that some other more independent examiner should have been employed. The independent examiners used in this case were the two physicians from whom Defendant obtained advice prior to denying Plaintiff's claim for benefits. As previously noted, Plaintiff has unsuccessfully challenged these experts' impartiality.

Plaintiff next takes issue with the fact the consulting physicians reference the lack of change in Plaintiff's condition between the time she worked and the time she ceased working in reaching their conclusion Plaintiff did not have a restriction preventing a return to her former job. This Court agrees with Plaintiff's position that simply because a claimant reaches a point in their medical condition where it is no longer bearable to work but makes a valiant effort to do so up to that point, the claimant should not be penalized in a later claim for long-term disability benefits. *See*, <u>Hawkins v. First Union Corp. Long-Term Disability Plan</u>, 326 F.3d 914, 918 (7th Cir. 2003). However, the medical records in this case indicate Plaintiff continued to work while obtaining treatment which was effective. While she certainly continued to suffer from her conditions, particularly the leg ulcers, and undoubtedly experienced considerable pain in the process, she also sought and obtained medication for the treatment and relief, albeit temporary. This Court does not find the consulting medical experts' opinions were solely based upon a lack

of change in Plaintiff's condition between the time she worked and the time she ceased working.

Plaintiff is also concerned with the comments in Dr. Dickerman's report that certain records were not present in the documentation he reviewed. However, as previously noted, Dr. Dickerman does not indicate his ability to reach an opinion is marred or put into doubt due to the lack of these records. Plaintiff was given every opportunity to amend the record and submit any additional documentation explaining her condition – an opportunity of which she availed herself. It was not unreasonable for Defendant to make a determination on Plaintiff's claim to benefits without further independent physical examination. Indeed, Defendant's decision and review as a whole was not arbitrary or capricious, unreasonable or unsupported by substantial evidence.

IT IS THEREFORE ORDERED that Defendant's decision and review denying Plaintiff disability benefits is hereby **AFFIRMED**. As a result, this action is hereby **DISMISSED**.

IT IS SO ORDERED this 25th day of April, 2007.

Kimberly E. West
United States Magistrate Judge
Eastern District of Oklahoma